MAYFLOWER RESTAURANT COMPANY, Appellant (Defendant),

Louis P. Kutsulis, et al. (Defendants),

v.

Henry Richard GRIEGO, Appellee (Plaintiff).

Henry Richard GRIEGO, Appellant (Plaintiff),

v.

MAYFLOWER RESTAURANT COMPANY, a Wyoming corporation, and John Lambousis, Appellees (Defendants),

Louis P. Kutsulis, et al. (Defendants).

Nos. 86–279, 86–280.

Supreme Court of Wyoming.

Aug. 19, 1987.

Don W. Riske, Cheyenne, for appellant Mayflower Restaurant Co. in No. 279, and appellees John Lambousis and Mayflower Restaurant Co. in No. 280.

Daniel E. White of Vines, Gusea & White, P.C., Cheyenne, for appellant Henry Richard Griego in No. 280, and appellee Henry Richard Griego in No. 279.

Before BROWN, C.J., and THOMAS, CARDINE and URBIGKIT, JJ., and RAPER, J., Retired.

BROWN, Chief Justice.

This case involves two appeals arising from personal injuries sustained in a bar room fracas. We will consider both appeals together.

Appellant, Mayflower Restaurant Company, (Mayflower), in case No. 279 raises the following issues:

"1. Whether the trial court erred in holding that appellant Mayflower Restaurant Company was liable, as a matter of law, for the acts and omissions of the agents and employees of the Mayflower Bar at the time of appellee's injuries."

"2. Whether sufficient evidence exists in the record to support the verdict against appellant Mayflower Restaurant Company."

Griego, as appellant in case No. 280, urges the following issues:

"I. Whether the trial court erred in granting summary judgment to John Lambousis.

"Argument A. Whether the trial court erred in determining, as a matter of fact and law, that Lambousis should not be considered to be a shareholder of the Mayflower Restaurant Company in the event the separate existence of the corporation is disregarded.

"Argument B. Whether the trial court erred in determining, as a matter of fact and law, that Lambousis should not be considered to be an owner or occupier of the real property and improvements where the Mayflower Cafe and Tavern is located.

"II. Whether the trial court erred in deleting the punitive damages award assessed against the Mayflower Restaurant Company."

Appellees, John Lambousis and Mayflower, raise an additional issue:

"Whether appellee John Lambousis is entitled to costs and attorney's fees under Wyoming Rules of Appellate Procedure 10.05."

We affirm in all respects.

On the evening of December 28, 1984, Henry Richard Griego, entered the Mayflower Cafe and Tavern located in Cheyenne, Wyoming. From the bacchanalians gathered at the Mayflower there emerged one, Allen Kinnison, who approached Griego several times threatening him in a loud and vulgar manner. On one occasion Kinnison grabbed Griego's shirt. In order to break up Griego and Kinnison, Rebecca Kister Kimbrough, a bar patron, asked Griego to dance. Kinnison withdrew as Griego and Kimbrough went to dance.

After the waltz was over, Griego was approached again by defendant Kinnison who was accompanied by defendant Robert Slater and others. Although the testimony differs, the end result of the confrontation was an altercation. Mayflower bouncers pulled Kinnison and an unidentified man off Griego and broke up the affray.[1] The bouncers then ushered Griego out of the bar although he was visibly groggy. Griego lost memory of events that occurred that evening. Eventually, Griego's head cleared when he was a short distance from the Mayflower Bar, and he was taken to the emergency room of Memorial Hospital by two unidentified persons.

At the hospital Griego was diagnosed as suffering from two fractures of the jaw bone. Additionally, he had numerous lacerations and contusions of the mouth and left eye. As a result of injuries sustained, Griego underwent open reduction surgery to repair the mandibular fractures and a metal compression plate was affixed to the jaw. Further, Griego suffered a loss of feeling or numbness in his lower lip and chin area.

Because of issues raised in this appeal, the history of the Mayflower Restaurant Company is significant. On July 22, 1976, the Mayflower Restaurant Company was incorporated under the laws of the state of Wyoming by defendants Kutsulis and Lambousis for the purpose of operating the Mayflower Cafe and Tavern. The corporation issued 10,000 shares of stock—4,900 shares to Kutsulis and 5,100 shares to Lambousis. On July 17, 1980, Lambousis and Kutsulis entered into two agreements under which Lambousis sold his interest to Kutsulis, including real property, improvements, and stock in the Mayflower corporation. Among other things, the agreements provided that the stock certificate representing Lambousis' 5,100 shares be held in escrow pending fulfillment of Kutsulis' obligations under the agreement.

---

1. In hockey matches the arbiters allow participants to refer to each other's ancestry and sex preference. They also tolerate much shoving and a modicum of hitting. All of this is part of the magic and atmosphere of a hockey specta-
cle. The officials ordinarily do not intervene until such time as someone is in danger of being "seriously killed." The role of a "bouncer" in a bar is not unlike that of an arbiter at a hockey match.

On February 2, 1984, the corporate charter of the Mayflower was revoked by the Secretary of State for its failure to file annual reports and pay annual license tax fees for two consecutive years. After Griego's injuries on March 15, 1985, the corporate charter of the Mayflower was reinstated.

On March 26, 1985, plaintiff Griego filed a complaint against Louis P. Kutsulis d/b/a the Mayflower Cafe and Tavern, Robert Slater and Allen Kinnison for injuries sustained in the assault at the Mayflower Bar. Later, Griego twice amended his complaint to add Mayflower Restaurant Company, a Wyoming corporation, and John Lambousis as party defendants.

On October 18, 1985, Mayflower filed its first motion for summary judgment contending that it could not be sued because it had no legal existence on the date of the incident. This motion was denied. On April 30, 1986, a second motion for summary judgment was filed by Mayflower and John Lambousis. Mayflower asserted the existence of two separate entities and Lambousis claimed nonliability because he was neither an owner nor stockholder in Mayflower at the time of the altercation. On August 4, 1986, the trial court found that

" * * * Defendant John Lambousis is not, as a matter of law, liable to Plaintiff by virtue of his status as a contract vendor of the real property on which the Mayflower Bar is located or by virtue of his status as a contract vendor of his shares of stock in Defendant Mayflower Restaurant Company * * *."

The court granted summary judgment in favor of defendant Lambousis, and also found that " * * * the purchase of Defendant Mayflower Restaurant Company after the date of Plaintiff's injuries, does not relieve Defendant Mayflower Restaurant Company from tort liability incurred before the date of purchase * * *."

Trial by jury commenced on August 19, 1986. The jury found generally in favor of plaintiff Griego assessing fault as 25 percent against Robert Slater, 25 percent against Allen Kinnison and 50 percent

against Mayflower and set compensatory damages at $25,000. The jury also assessed punitive damages against Mayflower in the amount of $6,000. Judgment on the jury verdict was filed on September 3, 1986.[2]

On September 4, 1986, Mayflower moved for judgment notwithstanding the verdict, for new trial and for remittitur. In an order filed on October 21, 1986, the trial court held that sufficient evidence existed to support the jury's finding that Mayflower was negligent and that plaintiff Griego's damages were proximately caused by such negligence but that the evidence was insufficient to support the jury's award of punitive damages against Mayflower. Both Mayflower and Griego appealed.

## SUMMARY JUDGMENT

In its first argument, appellant Mayflower contends that Louis Kutsulis was the sole proprietor of the Mayflower Bar since Mayflower's corporate charter had been revoked at the time of Griego's injuries. Hence, Mayflower contends it was not a legal entity at the time of injury to Griego, and therefore, the trial court erred in holding Mayflower liable, as a matter of law, for any negligent acts or omissions of the agent or employees of the Mayflower Bar.

Our oft-cited standard of review on appeal is that summary judgment properly issues only upon the dual finding that no genuine question of material fact exists and that the prevailing party is entitled to judgment as a matter of law. *Rompf v. John Q. Hammons Hotels, Inc.*, Wyo., 685 P.2d 25 (1984); and *Matter of Estate of Brosius*, Wyo., 683 P.2d 663 (1984). According to Rule 56(c), Wyoming Rules of Civil Procedure, a summary judgment

" * * * shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. * * * "

---

2. Judgment against defendant Kutsulis was rendered as a result of default.

The purpose of summary judgment is to eliminate formal trials where only questions of law are involved, *Johnson v. Soulis*, Wyo., 542 P.2d 867 (1975), and to pierce the formal allegations and reach the merits of a controversy where no material issue of fact is present. *Siebert v. Fowler*, Wyo., 637 P.2d 255 (1981).

■ The material facts are not in dispute. The parties agree that Mayflower's corporate charter was revoked on February 2, 1984; that the injuries sustained by Griego in the Mayflower Bar occurred December 28, 1984; and that Mayflower's corporate charter was reinstated on March 15, 1985. Therefore, the question is whether or not a corporation may be held liable for negligent acts which occur during the interim between the forfeiture and reinstatement of the corporate charter.

We approach this problem by first considering applicable state statutes giving the words employed by the legislature their plain and ordinary meaning in an attempt to construe legislative intent. Additionally, we read pertinent provisions together in an effort to determine legislative intent in enacting the law. Sections 17–2–102(a) and 17–2–103, W.S.1977, provide in part:

Section 17–2–102(a):

"If any domestic corporation shall for two (2) consecutive years neglect or refuse to file annual reports and pay the license tax herein provided, the certificate of incorporation shall be forfeited in the manner hereinafter provided and upon such forfeiture, all powers, rights and franchises conferred by law upon such corporation shall cease and terminate and become inoperative and void."

Section 17–2–103:

"If a charter of any corporation heretofore or hereafter organized under the laws of this state shall have been forfeited, or shall hereafter be forfeited, by reason of its failure to file with the secretary of state any reports required by law, or to pay the annual license fee required by law, * * * the secretary of state may at any time, upon the payment on behalf of such corporation of a sum equal to double the amount of fees and taxes then delinquent, plus the fee for the issuance by the secretary of state of the certificate hereinafter provided for, reinstate such corporation and restore it to all its franchises and privileges, and upon such payment the secretary of state shall issue his certificate entitling such corporation to resume its said business and its franchise, * * * provided, however, that this act (secs. 44–403, 44–404) [§§ 17–2–103, 17–2–104] shall not be held to authorize the reinstatement of any corporation whose charter shall have expired or been forfeited more than three (3) years prior to the date on which application for reinstatement is made. * * *"

Although our state statutes do not specifically provide that reinstatement of a revoked corporate charter will relate back to the date of revocation and validate all acts of the corporation in the interim, we believe it was the intent of the legislature in providing for reinstatement of the corporate charter to validate the corporation's privileges and existence from the date of revocation. See 13 A.L.R.2d 1220 (1950). It is apparent that the legislature recognized that failure to file reports and pay fees may be the result of inadvertence or neglect rather than an indication that the corporation is defunct or abandoned. Thus, it provided for reinstatement of the corporate charter upon payment of the appropriate fees and documents within the three year limitation. The reinstatement statute is clearly intended to make the voidance of the charter more in the nature of a suspension of corporate privilege rather than an absolute termination.

Additionally, the law provides for reinstatement of the corporate charter without the necessity of filing new articles of incorporation or taking other additional actions required by a new corporation. Therefore, it seems revocation under § 17–13–102, results in the suspension of the corporate right to do business, but not in the legal existence of the corporation itself.

Furthermore, we note that the majority view is that while the performing of corporate acts during forfeiture of a corporation

for failure to pay tax is without authority, subsequent reinstatement of the charter will validate interim acts as those of the existing corporation. See 13 A.L.R.2d, supra. 16A Fletcher, Cyclopedia of the Law of Private Corporations (1979), states:

"Provision is generally made for reinstatement of corporations which through default in making reports or paying the license fees required by law have had their right to transact business suspended or been stricken from the records. Consequently, so long as there is statutory right to be reinstated, the proclamation of forfeiture for nonpayment of taxes *does no more than forfeit the corporate right to do business, but does not extinguish the corporation as a legal entity.*" (Emphasis added.)

Numerous states with similar statutes embrace the same conclusion. In the case of *Bergy Brothers, Inc. v. Zeeland Feeder Pig, Inc.*, 415 Mich. 286, 327 N.W.2d 305, 309 (1982), the Michigan Supreme Court stated:

"We read the reinstatement statute as intended to make actions performed in the name of the corporation during the period of forfeiture corporate acts in the normal meaning of the term. Thus, corporate obligations incurred during the period of forfeiture are binding upon the corporation, and only upon the corporation—individual members are no more liable than had the forfeiture not occurred. * * * "

The court also stated:

" * * * [B]ecause the charter is subject to reinstatement, this Court has said: 'The corporation does not cease to exist upon its charter becoming absolutely void.' *Stott v. Stott Realty Co.*, 288 Mich. 35, 42, 284 N.W. 635 (1939). See also, *Mathews v. Life Insurance Co. of Detroit*, 284 Mich. 352, 357, 279 N.W. 858 (1938):

" 'It is manifest that voidance of the charter did not, ipso facto, work a dissolution * * *. As long as the corporation remained eligible to reinstatement of its charter the foreclosure suit

could be brought against it.' " Id., at 308.

In *J.B. Wolfe, Inc. v. Salkind*, 3 N.J. 312, 70 A.2d 72, 13 A.L.R.2d 1214 (1949), the relevant statutes provided that the corporation would become "inoperative and void" if taxes were not paid and that upon payment of delinquent taxes, and upon reinstatement the corporation would be "entitled to all its franchises and privileges." This language is very similar to that used in Wyoming. The New Jersey court held that a corporation which had entered into a contract while dissolved could maintain an action for breach after it was reinstated. Additionally, in explaining one of the reasons for its decision, the New Jersey court stated that it would be inequitable for a corporation to avoid its obligations to a third party by pointing to the corporation's dereliction with respect to the state, especially when its default had been cured by subsequent compliance with statutory requirements. See also, *Regal Package Liquor, Inc. v. J.R.D., Inc.*, 125 Ill.App.3d 689, 80 Ill.Dec. 957, 466 N.E.2d 409, 42 A.L.R. 4th 385 (1984); and *Kerney v. Cobb*, Tenn.App., 658 S.W.2d 128 (1983). Likewise, we do not believe that Mayflower should be allowed to utilize the interim period between forfeiture and reinstatement as a shield to avoid liability for negligence.

When a state statute provides for revocation of a corporate charter for failure to pay taxes or submit annual reports, the repeal of the charter does not terminate the corporation when provision for reinstatement is provided. Rather, it merely suspends the power of the corporation until it complies with the provisions of reinstatement. We hold that the statutory voidance of a corporation under § 17–2–102(a), does not obliterate all evidence of its existence, but rather, places it in a state of dormancy, subject to revival under the relevant statutory provisions. *Willey v. Brown*, Me., 390 A.2d 1039 (1978).

While we are aware that some cases speak to the fact that revived corporations are liable solely for contractual obligations incurred during dissolution, we find no ra-

tionale why a revived corporation should not be held liable for negligent action of its agents or employees under the doctrine of respondeat superior. We conclude therefore, that the reinstatement of a repealed corporate charter relates back to the date of forfeiture and validates acts of the corporation in the interim.

In appellant Mayflower's second argument, it alleges that the Mayflower Restaurant Company which was revived in March 1985 was a different entity than that which existed previously. Mayflower contends that the trial court erred, as a matter of law, in holding that it could be held liable for any negligent acts or omissions of the agents or employees of the Mayflower Bar.

*Garner v. Hickman,* Wyo., 709 P.2d 407, 410 (1985), states our applicable standard of review when a question arises as to whether or not a genuine issue of material fact exists. It states:

"When reviewing a summary judgment on appeal, we review the judgment in the same light as the district court, using the same information. *Randolph v. Gilpatrick Construction Company, Inc.,* Wyo., 702 P.2d 142 (1985); and *Lane Company v. Busch Development, Inc.,* Wyo., 662 P.2d 419 (1983). A party moving for summary judgment has the burden of proving the nonexistence of a genuine issue of material fact. *Dudley v. East Ridge Development Company,* Wyo., 694 P.2d 113 (1985). Material fact has been defined as one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Samuel Mares Post No. 8, American Legion, Department of Wyoming v. Board of County Commissioners of the County of Converse,* Wyo., 697 P.2d 1040 (1985). Upon examination of a summary judgment, we view the record from the vantage point most favorable to the party opposing the motion, giving him all favorable inferences which may be drawn from the facts. *Bancroft v. Jagusch,* Wyo., 611 P.2d 819 (1980)."

See also, *Stundon v. Sterling,* Wyo., 736 P.2d 317, 39 Ed.Law.Rep. 819 (1987).

It is clear that where there are genuine issues of material fact, summary judgment is improper, but the purpose behind summary judgment would be defeated if a case could be forced to trial merely by asserting that a genuine issue of material fact exists. *Duffy v. Brown,* Wyo., 708 P.2d 433 (1985); and *Johnson v. Soulis,* supra.

 Careful review of the record shows that Kutsulis and Lambousis entered into a personal agreement for the sale of stock in the Mayflower corporation. Mayflower was not a party to the agreement; therefore, the corporation itself never made a bona fide, arms-length sale of its stock to another entity or corporation. Furthermore, the corporation never sold any of its assets. Before and after these transactions, Mayflower transacted the business of a bar approximately in the same manner, at the same location, using the same personal property assets. The corporation retained the same name, used the same articles of incorporation and retained the same liquor license in its name.

We hold that Mayflower, the party moving for summary judgment, did not meet its burden of proving the nonexistence of a genuine issue of material fact, or that two separate corporations had emerged as a result of the transactions. We hold that the trial court properly denied both of Mayflower's motions, and determined that Mayflower was a proper party-defendant which could be held liable for any negligent actions proven to have been performed by the agents or employees of the Mayflower Bar.

Finally, in the last issue involving summary judgment, we address contentions brought by Griego, as an appellant in case No. 86–280. Griego insists that the trial court erred as a matter of fact and law when it ruled that Lambousis should not be considered to be either a shareholder or owner/occupier of real property and improvements of the Mayflower Restaurant Company. Griego contends that the trial court erred in granting summary judgment to John Lambousis.

 In *Stundon v. Sterling,* supra at 318, we noted that

" * * * [t]he initial burden is on the movant to show that there is no genuine issue of material fact. [Citation.] Once that showing is made, it is incumbent upon the party opposing the motion to come forward with specific facts to show that there is a genuine issue of material fact. [Citations.] Conclusory affidavits are insufficient and specific facts must be shown. [Citation.]"

Lambousis showed that an agreement was entered into between Lambousis and Kutsulis in which Lambousis sold his stock and certain properties to Kutsulis. As a part of the agreement, stock was put in escrow as security to ensure payment on the part of Kutsulis. Lambousis retained no control in the corporation or in the business and retained an interest in Mayflower solely as a contract vendor. These materials are sufficient to meet the movant's burden and to make a prima facie showing that there is no genuine issue of material fact as to duty or liability.

The affidavits, other evidences and arguments presented by Griego in opposition, rely primarily on the fact that the stock certificates and warranty deed were returned to Lambousis. These transactions and two lawsuits filed by Lambousis against Kutsulis only show that Lambousis was protecting his interests as a seller, and do not show that he retained control in the corporation as a shareholder or owner of corporate properties. We hold that Griego did not meet his burden in showing that there was a genuine issue of material fact.

When property is sold under a valid contract and an escrow created, the purchaser under the contract is the equitable owner and assumes all the risk, including liability of ownership, while the seller holds legal title in trust for the purchaser as security for the performance of the contract. See *Withers v. Board of County Commissioners of the County of San Juan*, 96 N.M. 71, 628 P.2d 316 (1981); and *Cox v. Fowler*, 169 Okla. 355, 37 P.2d 291 (1934).

We hold that the trial court properly determined that there was no genuine issue of material fact with regard to Lambousis, and we affirm summary judgment for Lambousis.

## SUFFICIENCY OF THE EVIDENCE

In appellant Mayflower's second issue, it claims that sufficient evidence did not exist to support the jury's verdict finding that Mayflower was negligent, and that such negligence was the proximate cause of Griego's injuries.

In considering these alleged errors, the standard of review of this court is as follows:

" * * * [W]hen dealing with questions of fact, this court will not ordinarily substitute its judgment for that of the jury. *Rissler & McMurry Company v. Atlantic Richfield Company*, Wyo., 559 P.2d 25 (1977). As a reviewing court, we assume the evidence of the successful party is true, leaves out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and gives to the evidence of the successful party every favorable inference which may reasonably be drawn from it. *Landmark, Inc. v. Stockmen's Bank & Trust Company*, Wyo., 680 P.2d 471, 473 (1984). So long as there is sufficient evidence upon which the jury could rationally base its findings, such findings will not be adjusted in any way by this court. *Thomasi v. Koch*, Wyo., 660 P.2d 806 (1983). We will rarely accept the invitation to place ourselves in the position of a substitute jury." *DeJulio v. Foster*, Wyo., 715 P.2d 182, 185 (1986).

In Mayflower's first contention, it is alleged that no evidence showed that Mayflower was put on notice of any danger to Griego. In support of this contention Mayflower relies heavily on the case of *Fisher v. Robbins*, 78 Wyo. 50, 319 P.2d 116, 120 (1957):

"[W]e do not consider it is a reasonable inference that when people become angry and argue violently with each other that such disagreement portends they will break bottles over each other's heads or otherwise resort to unlawful assaults and batteries. A mere battle of words, no matter how violent, *unaccompanied*

*by action, threat of action or some type of demonstration which gives warning that violence is impending,* usually causes no concern to those present * *." (Emphasis added.)

██ Evidence presented at trial shows that the exchange of pleasantries between Kinnison and Griego, was beyond that of a mere battle of words. Griego, testified as follows:

"Q. What did Mr. Kinnison do, if anything?

"A. He came over and was real vulgar. He used a lot of bad language. He started accusing me of all kinds of things.

" * * *

"Q. Did he threaten you in any way?

"A. Yes, sir.

"Q. How did he threaten you?

"A. He said, 'I should go out and just kick your ass.' He said, 'I would like to take you out in the alley and show you what I mean.'

"Q. All right. During this exchange, did Mr. Kinnison grab you in any way?

"A. Yes, sir.

"Q. How did he grab you?

"A. He grabbed my shirt.

" * * *

"Q. Now, then, when Mr. Kinnison threatened you, did he speak in a loud voice?

"A. Very.

"Q. Could you tell whether or not this exchange between you and Mr. Kinnison attracted any attention of any kind?

"A. Everybody around the bar sort of turned around and was looking. The bartender sort of stood back and watched."

Rebecca Kimbrough testified that Kinnison was loud and vulgar so as to attract the attention of those in the bar and that he not only grabbed Griego, but also grabbed her in an attempt to reach Griego. Defendant Kinnison also admitted that he was so loud as to attract the attention of bar employees. We determine that the threats of Kinnison to assault Griego and the grab-bing of his shirt factually distinguish this case from *Fisher v. Robbins,* supra, and provided Mayflower with notice that Griego was in imminent danger.

██ Second, Mayflower contends that it may not be found negligent because all parties separated for a period of time before the assault and because it was Robert Slater and not Kinnison whose acts of assault started the final disturbance. As stated in *Fisher v. Robbins,* supra, for evidence to be sufficient to support the jury's determination that an argument or other disturbance gave a tavern owner notice that an assault was impending, the disturbance must have been allowed to continue for an unreasonable period of time and be related to the eventual assault and injury.

Here, testimony indicated that the disturbance alerted employees of the bar; that Kinnison and Slater were together at the bar and had conversation concerning Griego; that only a short period of time elapsed between the disturbance and the assault; and that Kinnison was involved in the assault in tandem with Slater. Testimony also indicated that Slater approached Griego alone in a quiet manner, unaccompanied by Kinnison and suddenly and unexpectedly attacked Griego.

The evidence presented was susceptible to more than one conclusion, and either of two reasonable inferences could be drawn from it. The jury could have found that the disturbance was allowed to continue unreasonably, which related to the eventual assault that caused Griego's injuries. It was proper for the jury to determine which of the two, if either, was the more reasonable or probable. *DeJulio v. Foster,* supra; and *Bocek v. City of Sheridan,* Wyo., 432 P.2d 893 (1967). The finding was not clearly erroneous or contrary to the great weight of the evidence. We hold the evidence sufficient to support a holding of negligence on the part of Mayflower.

## PUNITIVE DAMAGES

██ At the end of Mayflower's case in chief, and again at the end of all evidence, Mayflower moved for a directed verdict. These motions were denied. After the ver-

dict, pursuant to Rule 50(b), W.R.C.P., Mayflower filed a motion for a judgment notwithstanding the verdict (JNOV). That motion was partially granted and partially denied.

Appellant Griego, in his second issue, contends that the trial court erred in deleting the punitive damages award assessed by the jury against Mayflower. We do not agree, and affirm the trial court's rejection of punitive damages.

This court has previously set out the rules we must follow in determining the propriety of denying or granting a JNOV. We said:

"When reviewing a trial judge's denial of motions for a directed verdict and for a judgment notwithstanding the verdict, this court must presume that all the evidence of the prevailing party is true. Further, we leave out of consideration all the opposing party's conflicting evidence while inferring from the prevailing party's evidence those conclusions which may reasonably and fairly be drawn. *White v. Ogburn*, Wyo., 528 P.2d 1167 (1974); and *Potts v. Brown*, Wyo., 452 P.2d 975 (1969)." *Caterpillar Tractor Company v. Donahue*, Wyo., 674 P.2d 1276, 1281 (1983).

Further, we have noted:

"* * * Punitive damages are not a favorite of the law and are to be allowed with caution within narrow limits. *Town of Jackson v. Shaw*, Wyo., 569 P.2d 1246 (1977). Since the purpose of punitive damages is not to compensate a plaintiff, but to punish a defendant and deter others, such damages are to be awarded only for conduct involving some element of outrage, similar to that usually found in crime. Restatement (Second) of Torts § 908 Comment b (1979). The purpose of punitive damages is not to provide a windfall to plaintiffs and their attorneys, but is to publicly condemn some notorious action or inaction on the part of the defendant. *Sinclair Oil Corporation v. Columbia Casualty Company*, Wyo., 682 P.2d 975 (1984); and *Campen v. Stone*, Wyo., 635 P.2d 1121 (1981).

"We have approved punitive damages in circumstances involving outrageous conduct, such as intentional torts, torts involving malice and torts involving willful and wanton misconduct. Punitive damages are not appropriate in circumstances involving inattention, inadvertence, thoughtlessness, mistake, or even gross negligence. *Danculovich v. Brown*, Wyo., 593 P.2d 187 (1979).

"Although degrees of negligence are not considered in comparative negligence, it must be remembered that the traditional concept of gross negligence visualized less culpable conduct than willful and wanton conduct. Gross negligence has been defined as:

"'* * * Indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence. But it is something less than the willful, wanton and reckless conduct. * * *' *Altman v. Aronson*, 231 Mass. 588, 121 N.E. 505, 506, 4 A.L.R. 1185 (1919).

"Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another. *Danculovich v. Brown*, supra." *Weaver v. Mitchell*, Wyo., 715 P.2d 1361, 1369–1370 (1986)

Griego directs our attention to several policies and circumstances that he contends manifest willful and wanton misconduct on the part of Mayflower that justify the punitive damages award. First, he points to the fact that Mayflower allowed the distur-

bance to continue for an unreasonable length of time, leaving Griego in imminent danger of injury. Second, he contends that Mayflower was guilty of willful and wanton misconduct when they did not provide medical assistance to Griego who, "was dazed and confused."

We agree that Mayflower may have been negligent in not stopping the disturbance promptly, in not rendering medical assistance and in escorting Griego out the front doors of the bar when he was in a dazed condition. There is no evidence that their action or inaction amounted to wanton and willful misconduct.

Sometimes the line between conduct justifying punitive damages and less culpable conduct is fine. *Weaver v. Mitchell,* supra; and *Sinclair Oil Company v. Columbia Casualty Company,* Wyo., 682 P.2d 975 (1984). Here we hold the conduct of Mayflower did not cross that fine line. The trial court was correct when it denied punitive damages to Griego from Mayflower and granted Mayflower JNOV with respect to those damages.

### ATTORNEY FEES

Next, John Lambousis asks that Griego be ordered to pay attorney's fees and damages for requiring him to defend this appeal. Rule 10.05, Wyoming Rules of Appellate Procedure, provides:

"When, in a civil case, the judgment or final order is affirmed, appellee shall recover the cost for typewriting and reproducing his brief, such cost to be computed at the rate allowed by law for making the transcript of the evidence. If the court certifies that there was no *reasonable cause for the appeal,* there shall also be taxed as part of the costs in the case, a reasonable fee, to be fixed by the court, not less than one hundred dollars ($100.00) nor more than five hundred dollars ($5000.00), to the counsel of the appellee, and to the appellee damages in such sum as may be reasonable, not exceeding one thousand dollars ($2,000.00), unless the judgment or final order directs the payment of money, and execution thereof was stayed, when in lieu of

such penalty, it shall bear additional interest at a rate not exceeding five percent (5%) per annum, for the time for which it was stayed, to be ascertained and awarded by the court." (Emphasis added.)

Rule 10.05, W.R.A.P., requires that we assess attorney fees and damages against Griego if we certify "that there was no reasonable cause for appeal." Griego's arguments were neither specious nor frivolous, but appear to be made in good faith. We will not add attorney fees and damages as costs.

Affirmed in all respects.