**Don WHITE, Appellant (Plaintiff),**

v.

**HA, INC., d/b/a Giovale's Bar, Appellee (Defendant).**

**No. 88–294.**

Supreme Court of Wyoming.

Nov. 21, 1989.

Roy A. Jacobson and Sharon M. Rose, of Vehar, Beppler, Jacobson, Lavery & Rose, P.C., Kemmerer, for appellant.

Richard H. Honaker and Michael D. Newman of Honaker & Hampton, Rock Springs, and Roger H. Bullock of Strong & Hanni, Salt Lake City, Utah, for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

GOLDEN, Justice.

Don White sued HA Inc., dba Giovale's Bar (Giovale's), claiming it was responsible for injuries he received outside the bar on the night of October 19, 1984, when he was shot in the back while attempting to flee a fracas which arose between White and his assailant Hank Summers, both bar patrons. The district court granted summary judgment to Giovale's, finding it had no duty to protect White from harm. On appeal, White asks:

A. Whether or not the trial court erred in its finding that there were no genuine issues of fact and granting summary judgment in favor of appellee. More particularly, did the court err in finding:

1. That there was no altercation in the appellee's premises sufficient to put appellee on notice of danger to appellant;

2. That there was no relationship between the disturbance in the appellee's premises and the subsequent events which resulted in appellant's injuries;

3. That there was not sufficient opportunity for the appellee to take action to protect appellant.

B. Whether or not the trial court erred in holding that *Mostert v. CBL & Assoc.,* 741 P.2d 1090 (Wyo.1987) was not applicable to the case at hand, and should only be given a limited application.

C. Whether or not the trial court erred in granting appellee's motion for summary judgment without giving consideration to appellant's cause of action based upon breach of the duty arising from the sale or furnishing of liquor.

Alternatively, Giovale's inquires:

1. Whether the trial court properly held that the fight which started outside was not reasonably foreseeable by Giovale's and there was no duty to protect Don White from the unexpected shooting.

2. Whether Don White failed to prove that a proximate cause of the shooting was any act or omission of Giovale's.

3. Whether Giovale's owed a duty to Don White to protect him from his own voluntary intoxication.

4. Whether punitive damages should be allowed.

5. Whether appellant's notice of appeal was timely.

We affirm. This decision renders unnecessary discussion of Giovale's fourth issue.

Don White began drinking at Giovale's Bar in the mid-afternoon of October 19, 1984, and continued to do so into the evening. Over the course of the afternoon and evening, White consumed six or seven mixed drinks and a pizza. In his deposition, White testified he "was getting a buzz on," but he was able to talk clearly, play pool and walk in a normal manner.

As the evening wore on, the bar became crowded with about forty to seventy bar patrons. One bartender was present and responsible for business activities in the

bar, including serving patrons, selling alcohol through the drive-in, restocking the bar, removing trash, and cleaning the bar premises. Hank Summers walked into Giovale's carrying a bottle of beer; he was acting very angry and looking for a man who he said owed him money. Giovale's did not serve any alcohol to Summers the short time he was in the bar. After entering the bar, Summers approached White's friend, Steve DePaola, and without provocation, hit him in the back of the head, knocking him down. At this time Summers did not speak to or take any action toward White, and White did not speak to Summers or take any action toward him. During this assault, Giovale's bartender was taking out the garbage and did not see what happened. When she returned to the patron area, several bar patrons told her what happened, but she noted "everyone was quiet," and "nobody was yelling, screaming, everybody had calmed down * * *."

Shortly after hitting DePaola, Summers left the bar through a side entrance. White and DePaola waited in the bar for several minutes and then left through the front door. In his deposition, White stated it was his intention to walk to DePaola's house to smoke some marijuana, but that he delayed leaving the bar so they would avoid Summers. White stated that he thought the fighting was over, but upon walking out the door DePaola headed for the parking lot to look for Summers, and White followed. Summers was not there, so they started to leave. While crossing the street DePaola saw Summers nearby, standing behind his car with the trunk lid open. DePaola started for Summers and White followed, reaching him first. White approached Summers and exchanged a few words which resulted in an exchange of several punches. The punching ended when the two fell to the ground. Believing the fight was over, White started to get up. As he was doing so he noticed Summers had a gun. White jumped up and ran; Summers shot him in the back.

White filed a complaint against Giovale's on February 24, 1986, alleging two counts: (1) Giovale's failure to exercise reasonable care to provide safe premises for its customers; and (2) Giovale's negligent sale or furnishing of liquor to an intoxicated person, White.[1] On July 25, 1988, Giovale's filed a motion for summary judgment. In its September 12, 1988 decision letter, the trial court granted Giovale's motion, finding in pertinent part:

> In the present case, the only disturbance which occurred in the bar was not between White and Summers so the defendant [Giovale's] had no reason to give White any protection, nor was there any relationship between the disturbance in the bar between Summers and DePaola and the disturbance outside the bar between Summers and Richmond [murdered by Summers that night] that would put the defendant on notice. It all happened so fast that no one could have averted the result. Calling the police would have been a waste of time, even if the defendant could have anticipated what was going to happen. I find nothing in this record which showed "a relationship between the particular disturbance which was relied upon as warning defendant of the impendence of danger to his invitees and the subsequent violence which caused plaintiff's injury."

This appeal followed.[2]

In this case, we are asked to extend the established scope of tavern keeper liability

---

**1.** White also sued Summers for his injuries. In the meantime, Summers was convicted of first degree murder for the slaying of another bar patron occurring the same night and for the attempted first degree murder of White. White's personal injury action against both Giovale's and Summers was stayed pending the outcome of Summer's appeal from those convictions. This court affirmed Summers' convictions. *Summers v. State,* 725 P.2d 1033 (Wyo. 1986), aff'd on rehearing, 731 P.2d 558 (Wyo.

1987). Thereafter, Summers failed to answer White's complaint and default was entered against him.

**2.** Although default had been entered against Summers, default judgment had not. As such, White requested a Rule 54(b) certification of the summary judgment granted to Giovale's believing that any "determination of damages should await the final decision of this appeal inasmuch as inconsistent results might arise if a determi-

to encompass injuries received by a bar patron off bar premises resulting from another bar patron's criminal acts. Earlier cases have suggested liability will lie in two instances: (1) when a tavern keeper serves intoxicating liquor to a minor or a person obviously intoxicated who later injures a third party either on or off the tavern premises, *McClellan v. Tottenhoff*, 666 P.2d 408 (Wyo.1983)[3]; and (2) when a third party is injured in the tavern by other patrons of the tavern who have exhibited behavior such as to alert the tavern keeper that danger or injury to the third party is imminent, *Mayflower Restaurant Company v. Griego*, 741 P.2d 1106 (Wyo.1987). In each of these cases, liability attached because of the tavern keeper's breach of some responsibility owed to the public, the collective third party. See *McClellan*, 666 P.2d at 413 (discussing the legislative establishment of a duty owed to the general public through the enactment of W.S. 12–5–301(a)(v) and 12–6–101(a)). White's action against Giovale's cannot be squeezed into either of the two pigeonholes suggested by *McClellan* and *Mayflower*, and we decline the invitation to peck out yet another to accommodate this fact situation, for to do so would make all of us our brothers' keepers, a result the law of Wyoming does not support.

■ As a preliminary procedural matter, we disagree with Giovale's contention that White's notice of appeal was untimely filed; we agree with White's correct statement that pursuant to W.R.C.P. 54(b), the summary judgment order in this case could "only be deemed final upon an express determination that there was no just cause

for delay." Only when the determination was made that there was no just cause for delay did the time for the filing of an appeal begin to run. See *Olmstead v. Cattle, Inc.*, 541 P.2d 49 (Wyo.1975). The 54(b) certification was entered in the form of a nunc pro tunc order on September 29, 1988. White filed his notice of appeal on October 6, 1988, well within the fifteen day time limit. Giovale's argues that as a nunc pro tunc order, the time for appeal began to run from the date of the original summary judgment, September 20, 1988, in that nunc pro tunc orders relate back to the date of the original order. That the order was entitled "Nunc Pro Tunc," does not alter our determination that the time for appeal began to run only upon its entry. The thrust of the order was a 54(b) certification that there was no just cause for delay. To dismiss this appeal based on the title of the order would be to assert form over substance. We find that White's notice of appeal was timely filed.

We analyze the substance of this appeal by noting our well-established standard of review for summary judgments which need not be reiterated. *Roybal v. Bell*, 778 P.2d 108, 110–11 (Wyo.1989); *Case v. Goss*, 776 P.2d 188, 190 (Wyo.1989); *Johnston v. Conoco, Inc.*, 758 P.2d 566, 568 (Wyo.1988). See also W.R.C.P. 56.

As in all tort actions, negligence consists of a breach of a duty owed by the defendant that proximately causes injury to the plaintiff. *McClellan*, 666 P.2d at 411 (citing *ABC Builders, Inc. v. Phillips*, 632 P.2d 925 (Wyo.1981)). Whether a duty exists is a question of law for the court to decide. *McClellan*, 666 P.2d at 411. This

nation of damages was made for purposes of the action against Hank Summers and another determination of damages made in the event this Court reverses the trial court's order and sends the case back for trial on the merits against Appellee." Finding no just cause for delay the trial court granted White's motion in the form of a Nunc Pro Tunc order on September 29, 1988.

3. *McClellan* is what has typically been called a "dramshop" case. Webster's Third New International Dictionary (G. & C. Merriam Company (1966)) instructs that the word "dramshop" is an archaic usage for the term barroom. A typical

dramshop act or civil damage act imposes liability on liquor vendors in certain situations. See § 30–102,. Connecticut General Statutes, Revision of 1958, Revised to 1981, which imposes limited liability on a seller who sells to an intoxicated person who injures another. Section 6–5–71, Code of Alabama, 1977, provides a right of action for every person injured by an intoxicated person "against any person who shall, by selling, giving, or otherwise disposing of to another, contrary to the provisions of law, any liquors or beverages, cause the intoxication of such person for all damages actually sustained, plus exemplary damages."

court has held a liquor vendor is bound to exercise the degree of care required of a reasonable person in light of the circumstances. *Id.* at 412.

The paradigmatic Wyoming case addressing tavern keeper liability is *Fisher v. Robbins*, 78 Wyo. 50, 319 P.2d 116 (1957). There, a bar patron was injured as a result of an altercation between two or three other patrons. A fifteen to twenty minute argument occurred in the bar between the other patrons culminating in one patron breaking a beer bottle over another's head. A particle of broken glass from the bottle flew into the plaintiff's eye; the plaintiff's eye later had to be removed. The plaintiff successfully brought a negligence action against the bar. In overturning the jury's verdict in favor of the plaintiff, this court articulated the rule to be applied here:

> [I]n order to recover from the * * * defendant, the burden [is] upon the plaintiff to prove: (1) a disturbance occurred which either did or should have attracted defendant's attention; (2) defendant had an opportunity to act; (3) defendant permitted the disturbance to continue without reasonable effort to quell the same; (4) defendant failed to give plaintiff reasonable protection; (5) there was some relationship between the disturbance and the subsequent violence; and (6) plaintiff was injured as a result of the violence.

*Fisher*, 78 Wyo. at 57, 319 P.2d at 118. Under *Fisher*, the duty to protect a third party from danger, above and beyond the general landowner duty to provide reasonably safe premises to all invitees, arises when the disturbance in the bar is sufficient to alert the tavern keeper that there is imminent danger of injury to a third party. If the disturbance is of such a dangerous nature to create the duty of protection, the tavern keeper breaches that duty if he permits the disturbance to continue.

The evidence presented at the *Fisher* trial about the disturbance indicated an argument developed between two bar patrons; a police officer entered the bar and was talking to the two patrons when a third patron approached the talking group, yelled a "cuss" word at one of the other patrons, and almost immediately, broke a beer bottle over the head of one of the other patrons. The plaintiff testified that the argument, occurring before the glass breaking incident, attracted his attention but that he did not continually direct his attention toward the two. *Id.* 78 Wyo. at 59, 319 P.2d at 118. Other witnesses testified they did not notice that two patrons were quarreling or anything else out of the ordinary. *Id.* 78 Wyo. at 63, 319 P.2d at 120. Characterizing the activities in the bar before the glass breaking incident as a battle of words, this court found the evidence insufficient upon which to attach liability to the bar, stating:

> [W]e do not consider it is a reasonable inference that when people become angry and argue violently with each other that such disagreement portends they will break bottles over each other's heads or otherwise resort to unlawful assaults and batteries. A mere battle of words, no matter how violent, unaccompanied by action, threat of action or some type of demonstration which gives warning that violence is impending, usually causes no concern of those present, any more than it seemed to have alarmed the plaintiff.

*Id.* 78 Wyo. at 64, 319 P.2d 120.

In two later cases involving tavern keeper liability, *McClellan* and *Mayflower*, this court assigned liability to the tavern keepers in two very limited circumstances. In *McClellan* a tavern keeper sold liquor to a minor who later became intoxicated on the liquor and killed a third person in an automobile accident. The district court entered an order dismissing the plaintiff's complaint against the tavern keeper for failure to state a claim, based on this court's holding in *Parsons v. Jow*, 480 P.2d 396 (Wyo. 1971), that there was no established common law cause of action in Wyoming against a vendor who unlawfully sells liquor to a minor who becomes intoxicated and injures a third party. When the *Parsons* case was decided, there was also no Wyoming dramshop statute changing the common law rule of nonliability. In the absence of such legislation the *Parsons* court was unwilling to create such a cause

of action on its own, despite the emerging trend among other jurisdictions. In accordance with this court's long-standing deference to the legislature,

> [t]he legislature of Wyoming has · not seen fit to change the common law rule as it applies in this case. Whether legislation in the nature of a dramshop act or civil damage statute should be included as a part of our liquor control code is within the province of the legislature.

*Parsons,* 480 P.2d at 397–98.

In overturning the district court's order dismissing the decedent's complaint and overruling *Parsons* in *McClellan,* this court no longer felt constrained to await the legislature's abrogation of the common law rule of nonliability.[4] It further acknowledged the· enactment of W.S. 12–5–301(a)(v) and 12–6–101(a), which established a duty on the part of tavern keepers toward the general public to protect them from intoxicated persons and minors who have consumed alcohol, recognizing "that these people are more likely to be unable to handle alcohol, that they need protection from themselves, and that society needs protection from them." *McClellan,* 666 P.2d at 413.[5] Liability was premised on the illegal sale of alcohol to a minor in violation of the above statutes, which was some evidence of negligence to be considered in the determination of liability. The court found it was the sale of the liquor to the minor or intoxicated person and not its consumption, as in *Parsons,* that was the proximate cause of the injury. *McClellan,* 666 P.2d at 409–10.

Perhaps the facts in *Mayflower* present a situation more analogous to this one, although detailing a much more egregious factual scenario in the bar. In *Mayflower,* a bar patron approached the plaintiff, threatened him in a loud and vulgar manner, and although unclear from the factual description, proceeded to physically attack him. Bouncers broke up the affray, but not before plaintiff's jaw was broken. Testimony at trial by other patrons in the bar and the assailant himself indicated the argument was of such a nature as to attract the attention of those in the bar, including the bar employees. *Mayflower,* 741 P.2d at 1114. The trial court determined, under a sufficiency of the evidence analysis, that the actions exhibited by the assailant were sufficient to provide the bar with notice the plaintiff was in imminent danger. This court affirmed the trial court's determination that the bar has a duty to protect a plaintiff in light of the known dangerous nature of an assailant's actions. In doing so, it factually distinguished *Fisher* where the altercation was characterized as "[a] mere battle of words, * * * *unaccompanied by action, threat of action or some type of demonstration which gives warning that violence is impending * * *.*" *Id.* 1113–14. The court concluded the altercation failed to put the bar on notice of any danger to the plaintiff. In comparison, the physical actions in *Mayflower,* following a conversation containing threats of physical violence between the plaintiff and his assailant, were held sufficient notice to the bar.

In both *McClellan* and *Mayflower,* the court recognized a duty to protect the respective plaintiffs. In *McClellan,* that duty arose by virtue of the existence of W.S. 12–5–301(a)(v) and 12–6–101(a), creating a duty to protect the general public against intoxicated persons and minors

---

**4.** See *Adkins v. Sky Blue, Inc.,* 701 P.2d 549 (Wyo.1985), for a critical discussion of the *McClellan* decision.

**5.** W.S. 12–5–301(a)(v) provides:
(a) Upon approval of the licensing authority, a drive-in area adjacent or contiguous to the licensed room may be used by the holder of a retail liquor license for taking orders, making delivery of and receiving payment for alcoholic liquor or malt beverages under the following conditions:

 * * * * * *

 (v) No order shall be received from nor delivery made to a minor or intoxicated person in the area.
W.S. 12–6–101(a) provides:
 (a) Every person who sells, furnishes, gives or causes to be sold, furnished or given away any alcoholic liquor or malt beverage to any person under the age of nineteen (19), who is not his legal ward, medical patient or member of his own immediate family, is guilty of a misdemeanor.

who consumed alcohol illegally sold to them. In *Mayflower*, the duty arose because the nature of the disturbance occurring in the bar placed the bar on notice that danger to the plaintiff was imminent. In *Fisher*, however, the nature of the disturbance was not such as to place the bar on notice that plaintiff was in danger of being injured; the evidence presented did not prove that the violence resulting in plaintiff's injury was caused or inspired by the argument between the other patrons. Accordingly, no duty on the part of the bar to protect the plaintiff arose on the part of the bar. The same is true here.

In *Fisher*, this court held it is "not enough merely to prove there was a disturbance and that the plaintiff was injured." *Fisher*, 78 Wyo. at 58, 319 P.2d at 118. Rather, "[P]roof of defendant's actual or implied knowledge of impending danger to his invitees and that he had reasonable opportunity to avert it [is] indispensable to entitle plaintiff to recovery." *Id.* Here, White failed to make even the threshold showing that Giovale's was placed on notice of impending danger to him. Such a showing is necessary to create a duty in Giovale's to protect him from harm. Absent this duty to protect there can be no breach by failing to avert the disturbance.

White relied upon the altercation in the bar between Summers and DePaola as the disturbance that should have warned Giovale's of impending danger to White. Evidence presented by White demonstrates that a brief altercation occurred between two bar patrons, Summers and DePaola; any disturbance in the bar created by the altercation ended when the assailant, Summers, voluntarily left the bar; DePaola remained in the bar with a third party, White, for several minutes after Summers left; at no time while in the bar did White and Summers talk to each other, or exhibit any aggressive behavior against one another. It was after leaving the bar to go to DePaola's house that White encountered Summers some distance away from the bar. White approached Summers and engaged in fisticuffs with him; immediately following the fight, White was shot in the back by Summers. This evidence, even taken in the light most favorable to White, is not sufficient to give rise to a duty on the part of Giovale's to protect White from danger.[6] Without sufficient notice of impending danger, no duty arose on the part of Giovale's to protect White.

White next asserts that the rule established in *Mostert v. CBL and Associates,*

6. In his brief on appeal, White suggests that Giovale's had notice that Summers had a gun, based on the bartender's deposition testimony that "someone had mentioned something about him [Summers] having a gun in his trunk * * *." White fails to mention, however, that the bartender later clarified her statement about her knowledge of Summers having a gun by indicating that any mention of gun was made only *after* the shooting:

Q. Do you remember any threats or talk about Hank Summers on the night of the shooting that he had a gun, or he could get a gun, or he would shoot somebody, or he would hurt somebody with a gun?
A. Something to that effect, I remember him saying something about a gun, I think, I'm not sure. I don't remember, I really don't remember.
Q. You don't remember.
A. I don't remember, no, I don't remember him saying anything about having a gun with him or in his car or anything like that, no. I heard someone else telling me that but I didn't hear him say that.
Q. Can you identify that mention by somebody else as being before the shooting, or is

that something that people were hashing out after the shooting?
A. That was after the shooting, they said they knew he had a gun in his trunk because they said he had a massive amount of cocaine in his trunk, or something to that effect, and that's why he had the gun there.
Q. So up until that time of the shooting, why, you had heard nothing about any gun?
A. No.
Q. And you heard nothing about Hank Summers having a gun in his trunk?
A. No.
Q. Did you see a firearm or any other weapon on Hank Summers inside Giovale's on the night of the shooting?
A. No.
Q. Did you see a gun or any other weapon on anyone inside Giovale's on the night of the shooting?
A. No.
Q. Until you walked outside and saw Hank Summers firing the gun did you have any knowledge or notice that there would be any gunplay by anybody?
A. No, I did not.

741 P.2d 1090 (Wyo.1987), is applicable here to create Giovale's liability. We disagree. This case is distinguished from *Mostert* because no duty exists here. In *Mostert*, a child died in the 1985 flash flood in Cheyenne. Just before her death, the child and her parents were watching a movie at the defendant's movie theatre. Outside the theatre a severe thunderstorm developed causing the National Weather Service, civil defense authorities and local law enforcement officials to issue severe thunderstorm, flash flood and tornado warnings. As the storm progressed, the authorities ordered that Cheyenne citizens stay indoors and off city streets in order to avoid injury or death. *Id.* at 1091. Despite its actual knowledge of the storm and the warnings, the defendant movie theatre failed to warn its business invitees, including the child, of the storm. As a result, the child left the theatre with her parents, traveled into the streets of Cheyenne and drowned. In this limited circumstance this court departed from the traditional rule that a business owner has no duty to warn an invitee of risks off the business owner's premises, and concluded that the movie theatre had a duty to advise its patrons of off-premises danger that might reasonably be foreseeable. *Id.* at 1096. This holding was premised on the foreseeability of harm to the child, due to the severe nature of the storm and the several public warnings. Here, however, we do not have such a case. The facts surrounding the disturbance in Giovale's were not sufficient to place the bar on notice that White was in imminent danger of being shot by Summers outside the bar. Consequently, no duty to warn or protect White arose.

 White also contends the trial court erred in failing to consider his cause of action based upon a breach of duty arising from Giovale's sale or furnishing of liquor to him; we shall style this as a "first party dramshop cause of action." White attempts to find foundation for this cause of action in the statement from dicta in *McClellan*, 666 P.2d at 413, that intoxicated persons need protection from themselves:

When alcoholic beverages are sold by a tavern keeper to a minor or to an intoxicated person, the unreasonable risk of harm not only to the minor or the intoxicated person but also the members of the traveling public may readily be recognized and foreseen * * *.

*McClellan*, 666 P.2d at 414–15 (quoting *Rappaport v. Nichols*, 31 N.J. 188, 156 A.2d 1, 6, 75 A.L.R.2d 821 (1959)). We disagree with White's contention that the language in *McClellan* creates a cause of action on the part of intoxicated persons against tavern keepers who sell or furnish alcohol to them. *McClellan* was concerned with a very specific fact situation, an injury occurring to a third person resulting from the sale of alcohol to a minor through a liquor drive-in business in violation of W.S. 12–5–301(a)(v). Its holding did not create a cause of action on behalf of intoxicated minors in general against a tavern keeper for its sale of alcohol to them. Nor did it create a cause of action for intoxicated persons in general against the tavern keeper. Instead, the holding in *McClellan* itself created a very limited cause of action for injured third parties against tavern keepers who negligently or illegally sell liquor to a minor or intoxicated person through a drive-in. "We hold that both § 12–5–301(a)(v), supra, and § 12–6–101(a), supra, establish a duty toward the general public." *Id.* at 413.

By this decision we join the majority of jurisdictions in holding that the tavern keeper has no duty to protect the intoxicated habitue from injuries he causes to himself, the rationale being that an individual should not be able to profit from injuries arising from his own voluntary intoxication. See *Noonan v. Galick*, 19 Conn. Sup. 308, 112 A.2d 892 (1955); *Wright v. Moffitt*, 437 A.2d 554 (Del.Supr.1981); *Bertelmann v. Taas Associates*, 735 P.2d 930 (Hawaii 1987); *Trujillo v. Trujillo*, 104 N.M. 379, 721 P.2d 1310 (1986); *Allen v. County of Westchester*, 109 A.D.2d 475, 492 N.Y.S.2d 772 (1985); *Sager v. McClenden*, 296 Or. 33, 672 P.2d 697 (1983). See also cases cited in Annotation, *Liability of Persons Furnishing Intoxicating Liquor for Injury to or Death of Consumer, Out-*

*side Coverage of Civil Damage Act*, 98 A.L.R.3d 1238–42. Cf. *Porter v. Ortiz*, 100 N.M. 58, 665 P.2d 1149 (N.M.App.1983) (recognizing minor's cause of action against a tavern keeper who knowingly sells alcohol to the minor when the sale proximately results in injury or death of the minor. This case specifically notes, however, that no such cause of actions extends to intoxicated adults.). Dramshop statutes have not generally been perceived as extending to injuries to the intoxicated person himself. See *Nolan v. Morelli*, 154 Conn. 432, 226 A.2d 383, 385 (1967). We quote from a case cited by Giovale's that captures our thinking on this issue:

> A duty should not be imposed upon the tavern keeper, and protection should not be extended, because the adult voluntarily created the vulnerability that is the problem. See *Allen v. County of Westchester*, 109 A.D.2d 475, 492 N.Y.S.2d 772 (1985). "To allow recovery in favor of one who has voluntarily procured a quantity of liquor for his or her own consumption with full knowledge of its possible or probable results 'would savor too much of allowing * * * [said] person to benefit by his or her own wrongful act.'" *Id.* at 480, 492 N.Y.S.2d at 776 (quoting from *Buntin v. Hutton*, 206 Ill.App. 194, 199).

*Trujillo*, 721 P.2d at 1313.

In summary, we conclude that Giovale's had no duty to protect White from being shot by Summers, as Giovale's had no notice that White was in imminent danger of injury. Summary judgment in favor of Giovale's was proper. There being no cause of action for an intoxicated consumer to recover from the tavern keeper who furnished the intoxicants, the trial court did not err in failing to consider White's second count premised on this theory.

Affirmed.

URBIGKIT, J., files a dissenting opinion.

URBIGKIT, Justice, dissenting.

I dissent for the reason first offered in *O'Donnell v. City of Casper*, 696 P.2d 1278 (Wyo.1985) and most recently stated in *Baros v. Wells*, 780 P.2d 341 (Wyo.1989), Urbigkit, J., dissenting. We again fail to give to the party appealing an adverse summary judgment the benefit of all favorable inferences which can be drawn from the record.[1] The majority again weighs the evidence to affirm summary judgment. In summary judgment review, we should confine the review to considering *whether an issue of negligence is presented by the evidence* and any fair inferences to be derived from that evidence. *Stephenson v. Pacific Power & Light Co.*, 779 P.2d 1169 (Wyo.1989); *Baldwin v. Dube*, 751 P.2d 388 (Wyo.1988); *Davenport v. Epperly*, 744 P.2d 1110 (Wyo.1987); *Greenwood v. Wierdsma*, 741 P.2d 1079 (Wyo.1987). The majority weighs the evidence when it presents an uncompleted analysis of the first prong under the *Fisher v. Robbins*, 78 Wyo. 50, 319 P.2d 116 (1957) test. A completed analysis would explore all inferences fairly drawn for appellant against the fact that a bar owner's duty may arise when an altercation *should* have attracted attention.

Another point lost in the majority's analysis, in deploying *Fisher*, 319 P.2d 116 and the relevant sections of *Mayflower Restaurant Co. v. Griego*, 741 P.2d 1106 (Wyo.1987), is that those cases allowed the plaintiff access to a jury and did not deal with review of summary judgment. By contrast, appellant here is denied a jury decision following trial.

The majority follows the district court in adopting appellee's characterization of the evidence and then seems to search for the most favorable inferences available to the bar. Because this court should consider the evidence only in the light most favorable to appellant during summary judgment review and because such a review mandates a contrary result, I must dissent from this procedure which denies a jury the decision of whether or not Giovale's Bar

---

1. "We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record." *Baros*, 780 P.2d at 342.

breached a duty under these circumstances. Obviously, a bar owner owes a duty of some nature to its patrons. This case calls into question whether that duty was violated under these factual circumstances. One man was shot dead, appellant was permanently injured after being shot in the back and Hank Summers is serving two concurrent thirty-five year to life terms for murder and attempted murder, *Summers v. State*, 725 P.2d 1033 (1986), *confirmed on reh'g* 731 P.2d 558 (Wyo.1987). I would leave it to the jury to decide where responsibility is located. Viewing the depositions of appellees, bartender Marsha Carter and owner/manager Richard Hiner, in the light most favorable to appellant and giving to him the benefit of all reasonable inferences, a far different story emerges.

It was Friday night when Summers pushed through Giovale's crowded bar. That crowd parted like the Red Sea when they saw him coming through the bar. They knew him to be an ex-boxer with a lightning quick temper and equally quick fists. From the evidence in the record, Carter was well acquainted with Summers' reputation for heavy drinking, bad temper and uncontrolled violence. Summers was again drunk and obviously angry because he was threatening to hurt someone named Dennis who he said owed him drug money. While the majority says the bar *should* not have been on alert by any of this, Summer's presence was so threatening even an off duty employee of the bar offered to pay him for that drug debt from money in the bar's till. When Summers and appellant had both gone outside, Carter not only knew there could be trouble going down but knew that Summers might have gone to get a gun.

Carter would not call the police until the lives of three men had been shattered—one dead, one incarcerated for murder and appellant seriously injured. Why did she fail to call the police when the smell of danger overpowered the smell of alcohol in the bar? This question is answered by this record that it was because the bar owner considered the presence of police not to be terribly good for business. House rules informed bartenders not to first call police when there was a threat of danger or harm to customers. The house rules were simple—profits before police and death and injury before patron protection. I dissent under the facts of this case because the bar designed its managerial system to neglect reasonable preventive care for the customers invited in to purchase a legal drug which robs the senses—alcohol.

Giovale's bar averaged one physical altercation a week during Hiner's tenure as manager. Yet, he instructed Carter to placate rather than chastise troublemakers. She was told never to call the police until she called him when trouble threatened or erupted. Out of the seventeen months Carter worked at Giovale's prior to the shooting, she recalled ten to twenty episodes of threatened violence, directed at either herself or her customers, serious enough for her to consider calling for police assistance. On none of those occasions did she actually call the police. When she asked Hiner to provide a bouncer for weekend security, he refused. So she was left alone on the night of the shooting to cater to fifty to sixty rowdy, mostly male bar patrons and various take-out customers. That was the bar into which Summers walked.

Carter knew Summers could be a troublesome drinker. Hiner had even warned her of his reputation for violence. That night, Summers was nothing but drunken trouble. Before briefly leaving the bar, he started shoving around another bar customer, Albert Carillo. Before his return to the bar, someone told Carter that Summers might have a gun in his car. Summers, himself, made mention of a gun to Carter, but she could not recall him stating he had one on his person or in his vehicle.

Carter was also aware that Summers, sometime after his return, had struck Steve DePaola from behind without provocation. Although she did not witness the assault, she observed Summers storm out of Giovale's shortly after the incident. As Summers was leaving, DePaola challenged him loudly to continue the fight outside the bar. Carter observed appellant's uncharacteristic anger over Summers' attack on DePaola, but noted that both appellant and De-

Paola remained in the bar for almost five minutes following Summers' departure. The incident worried Carter, but she took no immediate action. When she finally followed her initial inclination to summon the police, they arrived within one to two minutes of her call.

One may reasonably infer from the depositions that Giovale's accorded its patrons by policy and practice a "serve 'em and leave 'em" standard of care. Relevant as the mere existence of that policy might be to Giovale's culpability, the deposition testimony further suggests appellant was indeed victimized by Carter's implementation of that policy on the evening appellant was shot by Summers. The deposition testimony places in issue each of the six factors deemed necessary and material to appellant's recovery by the *Fisher* test. It indicates: (1) Giovale's bartender had, or at the very least *should* have had, notice of a serious and violent disturbance involving appellant and Summers; (2) that Carter had five minutes available to call the police for appellant's protection; (3) and (4) Carter utterly failed during that time to seek any help despite being very aware a violent and possibly armed assailant might be waiting for appellant and his companion to leave Giovale's; (5) subsequent violence occurred which involved the same participants as the earlier disturbance, solely in response to DePaola's challenge to continue that disturbance; and (6) appellant was injured by Summers' continued violence. What does it take to satisfy the *Fisher* test if not this?

The trial court and a majority of this court focused on the many discrepancies in Carter's deposition testimony and resolved them in the manner suggested by appellee. Such evidentiary interpretations, however, are matters for the jury after a full presentation of witnesses. They are wholly inappropriate when made by the trial court as a prelude to summary disposition. *Davenport*, 744 P.2d 1110. Contrary to the

majority's use of *Fisher*, that case can provide no support for this judicial incursion into the jury's domain. In *Fisher*, this court reversed a jury decision that an argument provided notice to a tavern operator sufficient to establish a duty to protect a patron. In *Fisher*, neither the party breaking the bottle which caused the plaintiff's injury nor the plaintiff were involved in the argument which allegedly notified the bar of impending violence. The *Fisher* court found the plaintiff's evidence regarding that disturbance insufficient to establish the bar had been forewarned of any potential harm to the plaintiff. Such is not the case here. Appellant presented evidence that he and his assailant were involved both in the initial disturbance and the resultant gunplay. Additional evidence indicates a jury could have found that the appellee *should* have known violence was likely to occur when appellant stepped outside. Granted, were we now faced with a challenge by appellant under a sufficiency of the evidence claim after a trial, the present record might not support appellant's challenge because then all inferences would be given to the *prevailing* party.[2] However, we are reviewing a granted summary judgment and appellant carries a different burden. He has met that burden.

Tort litigation often warns that certain behavior will not be encouraged or condoned. This holding will do the opposite and announce to tavern keepers that while "an individual should not be able to profit from injuries arising from his own voluntary intoxication," the tavern should be able to profit from income arising from the sale of such an intoxicating drug. When bar owners put profits ahead of reasonably exercised caution for the patron's or society's protection, *Mayflower Restaurant Co.*, 741 P.2d 1106; *McClellan v. Tottenhoff*, 666 P.2d 408 (Wyo.1983); *Fisher*, 319 P.2d 116, they should face a jury as to who should pay. Surely here, the jury as the conscience of the community, should be

---

**2.** "As a reviewing court, we assume the evidence of the successful party is true, [leave] out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and [give] to the evidence of the successful party every

favorable inference which may reasonably be drawn from it." *Mayflower Restaurant Co.*, 741 P.2d at 1113; *accord Landmark, Inc. v. Stockmen's Bank & Trust Co.*, 680 P.2d 471, 473 (Wyo.1984).

given the right to analyze duty and resulting economic responsibility for factually ignoring reasonable safety precautions. I refuse to accept the tale of this tragedy including violence, firearm use, death and injury magnified by evidence of a bar owner's mandate that the police should be called last as justification for adverse summary judgment. To me, indisputably, these events cannot foreclose finding at least some evidence from which negligence could be inferred with which a jury trial should be provided.

For these reasons, I respectfully dissent.